# GALT v. UNITED STATES.

---

PURE FOOD ACT; VERMINOUS FLOUR; FINDING OF TRIAL COURT; SAMPLE; APPEAL AND ERROR.

1 The pure food act of Congress of June 30, 1906 (34 Stat. at L. 768) being a health measure and remedial, will be liberally construed so as to give substantial effect, wherever possible, to the legislative intent. (Citing *United States* v. *Cella*, 37 App. D. C. 423, and *District of Columbia* v. *Gardiner, ante,* p. 389.)

2. Flour which has been contaminated by the husks and excreta of worms and other vermin is not saved from condemnation as a filthy substance under the pure food act, by the fact that the presence of the vermin alone would not, assuming them to be removable, render the act applicable, because it is directed at substances which are of themselves filthy, and not at articles containing foreign substances of that character.

3. A sample is that which is taken out of a large quantity as fairly representative of the whole. Whether it is so representative is a preliminary question for the trial court, whose ruling thereon will not be reviewed on appeal in the absence of the evidence upon which it was based, and then only when error clearly appears. The circumstances may be such as to warrant the trial court in submitting the question to the jury.

4. A finding of the trial court in a proceeding to condemn flour for violation of the pure food act, that two sacks taken by the government as samples from each of two lots containing 150 and 50 sacks respectively were fairly representative of those remaining, will not be disturbed on appeal where the evidence upon which it was based is not before the appellate court, and it appears that no evidence to the contrary was introduced in the lower court.

No. 2427.   Submitted November 5, 1912.   Decided January 6, 1913.

HEARING on appeal by libelees from a decree of the supreme Court of the District of Columbia condemning flour for violation of the pure food act.                    *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree in the supreme court of the District condemning 447 sacks of "Princess Flour" and 72 sacks of "Fancy Melba Patent" flour, under a libel filed by the United States through its attorney in and for the District of Columbia. The libel sets forth the possession by the appellants Harriet T. Galt and Ralph L. Galt, Copartners, trading under the firm name of William M. Galt & Co., within this District of "350 sacks, more or less, of flour labeled 'Princess Flour from Blanton Milling Co., Indianapolis, Ind;' and, further, 50 sacks, more or less, of flour labeled '140 lbs. Fancy Melba

Patent—Trade Mark Registered—From Choice Hard Wheat,. Majestic Flour Manufacturing Co., U. S. A., Distributors.' "

As originally filed the libel alleged that said flour was both adulterated and misbranded in violation of the pure food act. of June 30, 1906 (34 Stat. at L. 768, chap. 3915, U. S. Comp.. Stat. Supp. 1911, p. 1354). This averment was superseded by another which set forth that said flour is "adulterated within. the meaning and intent and in violation of the said act of Congress approved June 30th, A. D. 1906, in that the said flour consists in part of a filthy, decomposed, and putrid animal and. vegetable substance." Appropriate answer was filed and, a jury being waived, testimony was taken in open court, the parties agreeing that the court might "find the facts and declare the law applicable thereto and render judgment accordingly." The court filed a written opinion, which "was treated and considered by both court and counsel as the court's finding of facts. as aforesaid." Thereupon the case was appealed to this court,. the parties, according to the stipulation filed herein, "taking and considering the said opinion as and for such finding of facts."

The evidence which was before the trial court and upon which the decree is based is not in this record, and hence not before us. Searching the opinion of the trial court, we learn that the government on two occasions, permission of the court first having been obtained, took two sacks of flour "one from each of said *two lots* described, for the purposes of examination and analysis." Appellants were granted the same privilege, but did not exercise it. We now quote from the opinion: "The result of the examination of the four sacks. taken by the government as samples was that one of them contained worms, insects, and beetles, aggregating 3,525, and the other three, worms, insects, and beetles, aggregating 1,207,. 1,448, and 1,959, respectively."

Experiments were made by the department of chemistry,. showing that the said flour contained a large number of bacteria that were supposed to be injurious to the human body;. and, in addition to the worms, insects, and beetles that had

been sifted out of the flour, the evidence showed that there remained in the same, cases or husks made by the worms, as well as the excreta from them, all of which, it was claimed, rendered the said flour filthy within the meaning of said act.

There were a great many weevils discovered, and they were defined as the grain weevil, or wingless insects, which required a period of some six weeks, in warm weather, for full growth and development, during which time they passed through four distinct stages of existence,—first, in the form of the egg; then, the form of the larva; then, in the pupa form; and, finally, reaching the adult form,—and that after maturing, these insects might live for several months, and possibly for a year. In cold weather a longer time was necessary for their growth.

That the beetle known as "flour beetle" comes from a larva or worm, about half an inch long, and it breeds in flour and grain. Several of these beetles, in the larva state or in the adult state, appeared to be in said samples.

The evidence was that the flour was injuriously affected by the presence of such worms, insects, and beetles, by reason of their feeding on the gluten, and thereby destroying the strength and value of the flour, and rendering it unfit for making bread, or other domestic use, even if the foreign, filthy matter could be bolted or sifted out of it.

The court further found that it is not clear whether weevils may not come into flour while in storage, without any fault of the owner. Speaking of the sacks of flour here involved, the court said: "It appears that the four sacks taken were from different locations in the several piles of sacks; and it is argued on behalf of the government, that all the sacks seized were in a position to become affected by the dirt and filth from a stable near by." The court finally found "as matter of fact from the evidence that the said several sacks of flour are in a filthy condition, under the provisions of said act, by reason of the presence of the said worms, insects, and beetles in such quantities as shown, and from the condition which they have produced in the said flour."

*Mr. Henry E. Davis* for the appellants.

*Mr. Clarence R. Wilson,* United States Attorney, and *Mr. John Lewis Smith,* Assistant United States Attorney, for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

The so-called pure food act is entitled, "An Act for Preventing the Manufacture, Sale, or Transportation of Adulterated or Misbranded or Poisonous or Deleterious Foods, Drugs, Medicines, and Liquors," etc. Sec. 7 defines adulteration of foods and drugs, respectively, as follows: In the case of drugs: (1) If a drug differs from the standard strength, quality, or purity, unless the actual standard be plainly stated upon the box or other container; (2) if its strength or purity fall below the professed standard or quality under which it is sold. In the case of confectionery, which the act defines as a food, if it contains any mineral substances or poison, color, or flavor, or other ingredients deleterious or detrimental to health, etc. In the case of food, generally: (1) If any substance has been mixed or packed with it so as to lower or injuriously affect its quality or strength; (2) if any substance has been substituted wholly or in part for the article; (3) if any valuable constituent of the article has been wholly or in part abstracted; (4) if it be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed; (5) if it contain any added poisonous or added deleterious ingredient which may render such article injurious to health; (6) *if it consists, in whole or in part, of a filthy, decomposed, or putrid animal or vegetable substance,* or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter.

Sec. 8. of the act covers misbranding. It is provided therein that no label shall bear any statement, design, or device "which shall be false or misleading in any particular."

A most casual reading of this pure food act discloses that the purpose of Congress in its enactment was the better protection of the people of this country from adulterated or deleterious foods, drugs, medicines, and liquors. It is the duty of the court, in interpreting such statutes, to keep constantly in mind the legislative intent, the evils sought to be overcome, and, if possible, to give substantial force and effect to that intent. *United States* v. *Corbett,* 215 U. S. 233, 34 L. ed. 173, 30 Sup. Ct. Rep. 81; *United States* v. *Cella,* 37 App. D. C. 423. "It is the settled doctrine of this court," said Mr. Chief Justice Shepard in *District of Columbia* v. *Gardiner,* present term [ante, p. 389], "that a liberal and reasonable construction shall be given these statutes in view of their remedial objects and purposes so as to affect the same."

The first contention of appellants in the present case is that the act makes a distinction between adulteration which consists in adding to an article that which is not properly a part of it, and adulteration existing when some part of the article itself is not what it ought to be; in other words, "when some part of the article, whether animal or vegetable, *is* filthy, decomposed, or putrid,—not that the article *contains* a substance of that character foreign to its proper ingredients or constituents." In view of the finding of the court that the presence of worms, insects, and beetles in the condemned flour has produced a filthy condition thereof, it is unnecessary to determine whether appellants' contention is well founded. Aside from the fact that the evidence from which this finding was made is not before us, it is matter of common knowledge that the presence of such a large number of worms, insects, and beetles in such a substance as flour would render the flour filthy in the general acceptation of that term. This flour was not to be fed to swine, but was to be sold for human consumption. Even conceding that the worms, insects, and beetles could be separated therefrom, the flour would still be contaminated by reason of its contact with them, and it would still contain more

or less husks and excreta from the worms,—that is, it would still be filthy within the meaning of the act.

Appellants further contend that there was no evidence of the condition of the flour actually condemned by the decree. Of course it is not contended that it was necessary for the government to examine each of the large number of sacks of flour seized. The real contention, therefore, is that the samples examined were not representative of those remaining. 35 Cyc. 701, defines a sample as "that which is taken out of a large quantity as fairly representative of the whole." Whether a sample is fairly representative of the whole is a preliminary question to be decided by the trial court, and the decision then reached will not be revised in an appellate court unless the facts producing it are before that court,—and then only when error clearly appears. *Brown* v. *Leach,* 107 Mass. 367. Of course, the situation may be such as to warrant the trial court in submitting this question to the jury. *Lake* v. *Clark,* 97 Mass. 347. In *Origet* v. *Hedden,* 155 U. S. 228, 39 L. ed. 130, 15 Sup. Ct. Rep. 92, the point was made that the appraisers had examined certain cases only, out of two importations of a large number of cases of lace. The court said: "If there was a difference between the goods in the different cases of either importation, it is singular that the invoices are not set forth in the record. The inference is a reasonable one that they showed the goods in each importation to be of the same character and value, so that the examination of one case would be sufficient for all. There is nothing to indicate the contrary." The cases relied upon by appellants involved facts materially different from the facts in the present case, and in no way qualify the general rule previously stated.

Upon this branch of the case the trial court found: "Considering *the testimony as presented,* and the absence of testimony on behalf of the claimants, the court is forced to the conclusion that if other samples had been taken and analyzed, their examination would have shown similar conditions to those in the four sacks actually examined." The court further pertinently observed that, if the claimants could have shown to the

contrary, it might be assumed they would have introduced evidence. It further appears from said opinion that the samples taken were "from each of said *two lots* described," and it further inferentially appears that all the sacks seized "Were in a position to become affected by the dirt and filth from a stable near by." In view of what appears in the court's opinion as to the conditions surrounding the storage of this flour, the conclusion reached by the court from the testimony presented by the government,—which testimony is not before us,—and the failure of the claimants to present any evidence upon the point, we are clearly of the opinion that the samples examined must now be presumed to have been fairly representative of the two lots of flour. The decree will therefore be affirmed.

*Affirmed.*