## KAR-RU CHEMICAL CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 3, 1920. Rehearing Denied July 6, 1920.)

### No. 3368.

1. **Druggists ⬅⬌12—Misbranding held question for jury.**
   On the trial of an information under the Food and Drug Act[1] for shipping in interstate commerce drugs misbranded, in that the labels contained false and fraudulent statements as to their curative or therapeutic effects, evidence *held* to make questions for the jury as to whether they were misbranded, whether such statements were false and fraudulent, and whether the preparations were, as claimed, remedies in accordance with the theory and practice of homeopathy.

2. **Druggists ⬅⬌12—Instructions on misbranding held correct.**
   Instructions submitting the questions whether the drugs contained curative agents for the ailments set forth on the labels, and, if not, whether accused believed that the preparations would be effective for such ailments, and telling the jury that it was not proper to try rival well-established schools of medicine, and that, if he had only used homeopathic remedies, the verdict should be not guilty, etc., *held* proper.

3. **Druggists ⬅⬌12—Testimony that drug had no curative or medical value admissible.**
   In a prosecution for shipping misbranded drugs, the testimony of a doctor that preparations shown him and analyzed by another witness were absolutely worthless, and had no food, curative, or medical value, was admissible.

4. **Criminal law ⬅⬌1054(1), 1170½(1)—Overruling of objection to question held harmless, in view of modification on cross-examination and failure to except.**
   On the trial of an information for shipping misbranded drugs, the overruling of an objection to a question asked a witness as to whether there was any known medicine that would "cure" a number of diseases *held* harmless, in view of the witness' attempt to modify his negative answer, and his modification thereof on cross-examination, and also in view of the failure to except.

In Error to the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Information by the United States against the Kar-Ru Chemical Company. Judgment for the United States, and defendant brings error. Affirmed.

The United States by information charges the defendant with a violation of sections 2 and 8 of the Act of Congress of June 30, 1906, known as the Food and Drug Act (34 Stat. 768 [Comp. St. §§ 8718, 8724]), as amended by the Act of August 23, 1912 (37 Stat. 416 [Comp. St. § 8724]).

⬅⬌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
[1] Comp. St. §§ 8717-8728.

Frank H. Kelley, of Tacoma, Wash., for plaintiff in error.

Robert C. Saunders, U. S. Atty., of Seattle, Wash., and Frederick R. Conway, Asst. U. S. Atty., of Tacoma, Wash.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge. The Food and Drug Act of June 30, 1906 (34 Stat. 768), provided in section 2 as follows:

"That the introduction into any state * * * from any other state * * * of any article of food or drugs which is * * * misbranded" within the meaning of the act is prohibited, and that "any person who shall ship or deliver for shipment from any other state * * * to any other state * * * any such article so * * * misbranded" within the meaning of the act "shall be guilty of a misdemeanor."

Section 8 of the act provided:

"That the term 'misbranded,' as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any particular."

In U. S. v. Johnson, 221 U. S. 488, 31 Sup. Ct. 627, 55 L. Ed. 823, this act came before the Supreme Court of the United States upon the question as to the meaning of the word "misbranded," as defined in the act, with·respect to a false statement on the label. The court held:

"That the phrase is aimed not at all possible false statements, but only at such as determine the identity of the article, possibly including its strength, quality and purity"

—and not at statements as to curative effect. In that case it was charged that the label stated or implied that its contents were effective in curing cancer, the defendant well knowing that the representations were false. The court held that, even if the statement was misleading, it was not covered by the statute. This decision was rendered in May, 1911.

President Taft almost immediately transmitted to Congress a special message calling attention to the necessity of passing at an early date an amendment to the Food and Drug Act supplementing the existing law to "prevent the shipment in interstate and foreign commerce of worthless nostrums labeled with misstatements of fact as to their physiological action." In the course of the message the President said:

"In my opinion, the sale of dangerously adulterated drugs, or the sale of drugs under knowingly false claims as to their effect in disease, constitutes such an evil and warrants me in calling the matter to the attention of the Congress. Fraudulent misrepresentations of the curative value of nostrums not only operate to defraud purchasers, but are a distinct menace to the public health. There are none so credulous as sufferers from disease. The need is urgent for legislation which will prevent the raising of false hopes of speedy cures of serious ailments by misstatements of fact as to worthless mixtures on which the sick will rely while their diseases progress unchecked." 62d Congress, 1st Sess., 47 Cong. Record, part 3, page 2379.

In response to this message an amendment to the act was introduced in the House, which was explained by Mr. Sherley, its author. In the

course of his remarks he referred to the President's message and the decision of the Supreme Court in the Johnson Case, in which he stated that the court had held:

"That the sections of the Pure Food Law relating to misbranding did not embrace statements as to the curative or therapeutic properties of drugs There was a very strong dissent handed down by Justice Hughes. and concurred in by Justice Day and Justice Harlan, holding that a proper construction of the act would embrace such cases. The majority of the court seem to have gone on the idea that it was not the intention of Congress to enter into the domain of matters in issue between rival schools of medicine, but, as is very clearly set out by the minority in their dissenting opinion, there were a great many cases that did not belong in this twilight zone, but represented plain cases of fraud and deceit. In the opinion of the minority of the court, it was the intention of the law to reach such cases, and, believing it certainly ought to be the intention of the law to reach them, I introduced the bill now before the House. Just after its introduction, the President called attention to the importance of the decision and the need of a remedy by a special message to Congress. This act has been drawn with some care, and as perfected by the amendments offered will certainly reach those cases of fraud without undertaking to have the government enter into the disputed domain that lies outside of proper legislation." 62d Cong., 2d Sess., 48 Congressional Record, part 11, page 11322.

The amendment was passed. It provided, among other things, the addition of a paragraph to section 8 of the Act of June 30, 1906, defining misbranding, as follows:

"Third. If its package or label shall bear or contain any statement, design, or device regarding the curative or therapeutic effect of such article or any of the ingredients or substances contained therein, which is false and fraudulent."

The information in this case contains four counts. The first count charges the defendant with the unlawful shipment and delivery for shipment via United States mail from the city of Tacoma, state of Washington, to the city of Portland, state of Oregon, consigned to Clarke Woodward Drug Company, a certain package containing three boxes, each box containing an article designed and intended to be used in the cure, prevention, and medication of diseases of men. The character and brand of the boxes is set forth, and it is charged:

"That when shipped and delivered for shipment as aforesaid said article of drugs was then and there misbranded within the meaning of the said act of Congress, as amended, in that the following statement regarding the therapeutic or curative effect thereof appearing on the label aforesaid, to wit: 'Kar-Ru,' the constitutional remedy for Rheumatism * * * It is effective in Kidney, Liver, Bladder, Stomach, and Catarrhal Troubles, Mental and Physical Debility, Neuritis, Eczema, Blood Diseases, Irregular Menstruation, and the most Acute and Chronic Rheumatic Afflictions'—was false and fraudulent in this: that the same was applied to said article unlawfully and in reckless and wanton disregard of its truth or falsity, so as to represent falsely and fraudulently to the purchasers thereof and create in the minds of the purchasers thereof the impression and belief that the article was in whole or in part composed of or contained ingredients or medical agents effective among other things as a remedy for rheumatism. * * * or effective as a remedy for kidney, liver, bladder, stomach or catarrhal troubles, or effective as a remedy for mental or physical debility, neuritis, eczema, blood diseases, irregular menstruation or the most acute and chronic rheumatic afflictions, when in truth and in fact said article was not in whole or in part composed of and did not contain any ingredients or medical agents effective among other things as a remedy for rheumatism, or effective as a remedy for kidney, liver, bladder, stomach or

catarrhal troubles, or effective as a remedy for mental or physical debility, neuritis, eczema, blood diseases, irregular menstruation, or the most acute or chronic rheumatic afflictions."

The other three counts were identical with the first count, except as to the name of the article shipped, namely, Gon-Nol for diseases of men, Kar-Nitum for diseases of cattle, and Kar-Kol for diseases of man and hogs. Upon the trial of the case before a jury, the corporate capacity, identity, and domicile of the defendant and the shipment of the articles described in the information were admitted, and evidence was introduced in support of the information and for the defendant. The jury found the defendant guilty upon all four counts. The defendant contends that there was no substantial evidence to sustain the charges in the information that the packages in question were misbranded within the meaning of the act of Congress as amended. The claim of the defendant is that this is a controversy relating to the efficacy of homeopathic remedies, and that the theory of the prosecution arises upon the testimony of its medical witnesses that homeopathic remedies were worthless. Assuming that the exceptions reserved by the defendant at the trial were sufficient to raise whatever questions there may be in this contention, the question is: What were the questions of fact submitted to the jury?

[1] The prosecution introduced the testimony of E. O. Eaton, a chemist in the employ of the government at the San Francisco laboratory, who testified that he had analyzed samples of Kar-Ru, which showed sugar, 83.4 per cent.; starch, 12.6 per cent.; charcoal, 1.63 per cent. He did not find any other active medical ingredient, except one part to a million of arsenic in some of the samples. There was a certain amount of water and a small amount of ash, or inorganic salts. When samples were burned, ash was left. Some samples showed ash .15 of 1 per cent., and all of them mixed together 1 part arsenic to a million. Alkaloids, chloroform, and ammonium salts were absent, as well as heavy metals, except a trace of iron. He analyzed samples of Gon-Nol, in which he found sugar, 61.75 per cent.; starch, 30.1 per cent.; ash, .65 per cent., consisting of calcium, sodium phosphate, potassium, iron salts, ammonium salts, arsenic, 1 part in a million; charcoal, 12 per cent,; heavy metals, trace of iron. He analyzed samples of Kar-Nitum, and found sugar, 76.7 per cent.; starch, 15.9 per cent.; charcoal, 2.85 per cent.; ash, .55 per cent.; arsenic, 5 parts to a million. He analyzed Kar-Kol and found sugar, 81.9 per cent.; starch, 13.8 per cent.; charcoal, 2.15 per cent.; ash, 3 per cent.; arsenic, 6 parts to a million.

On cross-examination this witness testified that he first made a qualitative analysis, to find the different ingredients, and then a quantitative analysis, to find the amount of each. He was asked whether in his tests he could have caught small quantities of certain elements, such as ammonium salts, ferric chloride, and iodine. He thought he could have detected any small amount, but could not say whether he would have detected a quarter of a grain of ammonium salts. He knew he could have detected a half grain. With respect to ferric chloride and iodine he could have caught one-tenth of a grain, but

could not say if he would have detected minute parts on indeterminable quantities. He made a test for nitric acid. He would have detected probably a drop in a gallon. He found one part in a million of arsenic.

The prosecution called Calvin S. White, a major in the Medical Reserve Corps of the United States Army, educated in the University of Pennsylvania and Oregon. Analysis of the elements in Kar-Ru was submitted to the witness, and he testified that—

It would be worthless in the cure of any disease. "It is all inert, and there is nothing there which could possibly be a curative agent in any disease. It is not possible to get any one medicine which will cure all of the different diseases enumerated."

The analysis of the elements of Gon-Nol was submitted to the witness and he testified that—

"It would have no effect at all. It would do neither harm nor good."

On cross-examination the witness testified that—

He had informed himself of the practice of the homeopathic school of medicine. "There is no school which teaches the use of those things for rheumatism" (referring to pulsatilla and lycopodium). The homeopaths did not recognize arsenic as a remedy for chronic rheumatism.

J. B. McNerthney, a witness for the prosecution, testified that he had been practicing medicine for 16 or 17 years; that he had a medical education in the University of Minnesota and New York and a postgraduate at Berlin and Vienna. The synoptical analysis of the formula of Kar-Ru was submitted to him. He testified that—

"It would have no medical value. * * * Absolutely no school of medicine would recognize it as a remedy."

The synoptical analysis of Gon-Nol was submitted to him. He said it appeared to contain no medical qualities and was absolutely worthless as a cure for gonorrhœa. In his opinion it would not be recognized in any school of medicine. From an examination of the synoptical analysis of the formula of Kar-Kol, he testified that it appeared to contain no drugs of medical value and was absolutely worthless in the treatment of cholera or diarrhœa in human beings. It would not be considered a remedy in any recognized school of medicine. That the medicine contains 6 parts in a million of arsenic would not give it any medical value. The addition of lycopodium, pulsatilla, sulphur, nitric acid, and thuja in small quantities as not to be discovered by the chemist would be worthless in the cure of any disease.

Chester H. Woolsey, for the prosecution, testified that—

He had studied medicine at the University of California, took a postgraduate course at Cornell, did some work at Columbia, and was then an instructor at Stanford University. "From what the analysis of Gon-Nol shows, it would not have the least effect and would be absolutely worthless in any form of gonorrhœa. It would do more harm than good, because the patient would be wasting time with the useless remedy while the disease was getting a firmer hold on him. * * * The formula which the analysis disclosed would not be recognized by any school of medicine that I know of as a remedy

for gonorrhœa. \* \* \* From the examination of the synoptical formula of the analysis of Kar-Ru, I would say that Kar-Ru is absolutely worthless as a remedy for rheumatism, kidney, liver, stomach, and catarrhal troubles, mental and physical debility, neuritis, eczema, blood diseases, irregular menstruation, and the most acute and chronic rheumatic afflictions."

H. K. Faber, a graduate of medicine from the University of Michigan and associate professor of medicine at Stanford University, at that time in the Base Hospital at Camp Lewis, P. B. Swearingen, a graduate of the St. Louis University, who had taken a special postgraduate course in New York and Chicago and had been a practicing physician for 26 years, and Royal M. Gove, who had been practicing medicine in Tacoma for 28 years, were called as witnesses for the prosecution, and all testified to substantially the same effect as the preceding witnesses.

H. J. Shore, holding a veterinary degree and employed as a bacteriologist by the United States Department of Agriculture, N. A. Madsen, a graduate of Iowa State College and Veterinarian College of Copenhagen, employed by the United States Department of Agriculture as meat inspector, and Samuel B. Foster, a graduate of the Washington State College for Veterinary Medicine and employed by the United States government in the tuberculosis eradication work in Washington and Oregon, testified for the prosecution that from the analysis of Kar-Nitum the preparation would not be a remedy for tuberculosis or relief of the disease at any stage.

At this point the prosecution rested its case. The defendant did not move for an instructed verdict in its favor, but proceeded to introduce evidence for its defense.

P. H. Hebb was called and testified that he was the president, manager, and practically the only stockholder of the defendant corporation; that he was not a medical man by profession, but for 7 or 8 years had been reading and studying medicine, particularly homeopathic medicine; that they put upon the market some medicines for common ailments, both for man and beasts; that he wrote the labels for Kar-Ru, Gon-Nol, Kar-Nitum, and Kar-Kol, and in so doing he used common and accepted terms rather than medical terms; that they all contained medical curative agents; all are made on a base of triturated sugar, carbo-vegetalis, commonly known as charcoal. This base merely carries the medical agents, and is similar in purpose to the half glass of water in which medicine is often administered. The witness was asked on cross-examination, "How much tuberculinum is there in Kar-Nitum?" His counsel objected to this question on the ground that the witness could not be compelled to disclose to the public his trade secrets. It was sufficient, he contended, to meet the charge in the information, to show that the remedies contained curative agents, even one curative agent, in quantity sufficient to act medicinally as recognized and practiced by any school of medical practitioners. The objection was overruled, and the witness answered, "In the sixth potency." How much that was he could not say; it was less than one in a thousand. The witness was asked as to the potencies of arsenic and pulsatilla in Kar-Ru. He replied that he used

the sixth potency of arsenic; from the seventh up of pulsatilla; thuja, the eighth; nitric acid, the ninth; lycopodium, tenth; sulphur, eleventh. In Gon-Nol he used the following potencies: Medorrhinum, sixth; sulphur, seventh; arsenicum, eighth; thuja, ninth; lycopodium, tenth; nitric acid, eleventh.

A. H. Grimmer, for the defense, testified that he resided in Chicago; was in general practice as a physician; had been adjunct professor in the Hahnemann Homeopathic Medical College of Chicago for 10 years, and for 12 years had conducted classes in postgraduate work, members of which came from all over the world—many from Europe, particularly from the London Homeopathic Hospital; that homeopathy is an organized system of medicine, which maintains colleges and hospitals, has its county and state medical associations, is recognized in every state of the Union, and in Michigan, Iowa, and California has homeopathic departments in the State Universities, maintained at state expense. Potencies are in general use in the homeopathic practice. The degree varies with the individual practitioner. Homeopathy, as other schools of medicine, seeks to diagnose a case before prescribing. He testified as to the potencies of the remedies used for the diseases mentioned on the labels attached to the packages in controversy; that the remedies would contain curative agents for such ailments. The witness was the father-in-law of Mr. Hebb, the president, manager, and practically the only stockholder of the defendant corporation.

[2] Upon this evidence it was clearly a question of fact for the jury to determine whether the preparations offered to the public by the defendant and described in the information were in fact misbranded in the statements regarding their therapeutic or curative effect and whether such statements were false and fraudulent. The defendant having defended on the ground that the preparations were remedies in accordance with the theory and practice of homeopathy, that question also became a question of fact for the jury, to be determined under proper instruction from the court. Upon this issue the court instructed the jury as follows:

"Do the several preparations put upon the market in interstate commerce by the defendant in fact contain curative agents for the several ailments set forth upon the labels of these respective preparations? If you find from the evidence that each and every of these preparations do in fact contain such curative agents, your verdict will be not guilty under each and every count of the information. If you find as a fact that one or more of these preparations does not in fact contain such curative agents, then, as to such preparations, it will be necessary to consider the second question in the case which is: Did the defendant in fact believe that the preparation in question would be effective in alleviating the ailments for which its label says it is intended to be used?"

"It is not proper in such a case as this to try rival well-established schools of medicine, and, if you find that the defendant has only used in its several preparations homeopathic remedies for the alleviation of ailments, then your verdict should be not guilty, and you will not be called upon to consider any other question in the case."

"If you find, however, as a fact, that some or all of the preparations put upon the market by the defendant do not, in fact, contain remedial agents used in any school of medicine for the relief of the ailments for which it is put upon the market, then you will be called upon to consider the second question in the case, and that is: Did the defendant honestly believe that such remedy

would have a curative effect upon the ailments for which it is offered to the public? The law requires that the government must prove beyond a reasonable doubt, not only that the statements upon the labels are false, but also that the statements are fraudulent. The statements may be false and not fraudulent. To be considered fraudulent within the meaning of the law requires that the defendant should either know that the remedy which he offers to the public is of no curative value or that he represents to be of curative value recklessly and without caring whether it would cure or whether it did not, for the purpose of defrauding his customers and getting their money for an article which he knew in fact, or ought to have known, was of no value. If you find from the evidence that the defendant honestly believed, and had reasonable ground to believe, that his remedy was of curative value, then your verdict must be not guilty, no matter if in fact the remedies were worthless from a medical point of view."

These instructions were in accordance with the law as declared by the Supreme Court in Seven Cases of Eckman's Alterative v. U. S., 239 U. S. 510, 517, 518, 36 Sup. Ct. 190, 193 (60 L. Ed. 411, L. R. A. 1916D, 164), where the court excluded the field where there might be differences of opinion between schools and practitioners, and explained the words "false" and "fraudulent" to conform to such exclusions. The court said:

"It cannot be said, for example, that one who should put inert matter or a worthless composition in the channels of trade, labeled or described in an accompanying circular as a cure for disease when he knows it is not, is beyond the reach of the law-making power. Congress recognized that there was a wide field in which assertions as to curative effect are in no sense honest expressions of opinion, but constitute absolute falsehoods and in the nature of the case can be deemed to have been made only with fraudulent purpose. The amendment of 1912 applies to this field and we have no doubt of its validity."

[3] It is objected that the court allowed Dr. White, a witness for the prosecution, to testify that the preparations which had been analyzed by the chemist Eaton and shown to the witness were absolutely worthless and had no food, curative, or medical value. The testimony was clearly admissible. In the case just cited, the court held that the law does reach one who puts inert matter or a worthless composition in the channels of trade, labeled as a cure for disease when he knows it is not.

[4] The remaining errors assigned relate to the action of the court in overruling objections to questions put to witnesses as to the curative value of arsenic in a portion of one part to a thousand, and as to whether there was any known medicine that would cure kidney, bladder, liver, stomach, catarrhal troubles, mental and physical debility, neuritis, eczema, blood diseases, irregular menstruation, and the most acute and chronic rheumatic afflictions, gonorrhœa, cholera, and diarrhœa in human beings. The objection was overruled, and the witness answered, "Why, no," and then said, "I might modify that by—" The court said: "You have answered the question. Is there anything further?" The objection was the use of the word "cure." In support of the objection, it was said:

"There is no representation by the defendant that the medicines will 'cure' any of these diseases, or that he has any one medicine which is a remedial agent for all of them."

On the cross-examination of the witness, which immediately followed his answer, he said:

"Medicines might be combined, so that the combinations would have a beneficial effect upon persons suffering from one or more of the diseases enumerated. For instance, if a man were suffering from kidney disease, or Bright's disease, the physician would have to make a diagnosis of Bright's disease, and then select the drug, and then he would have to have some dosage. Then, if a man had stone in the bladder, or some bladder trouble, you would have to make a diagnosis first, and select a drug and have a proper dosage, a dosage strong enough to dissolve or neutralize whatever acid there was in the kidney or bladder, but first you would have to diagnose it. Then you would use a medicine, just the same as you would use a knife to remove it, and it must be in a sufficiently powerful dose to work. That is my method of practicing medicine, and there are no other methods which are any good that I know of."

In view of the fact that no exception was taken to the answer of the witness, his proposed modification, and modification on cross-examination, we do not see that the defendant was prejudiced by the question.

With respect to the remaining objections as to whether the remedies contain any alkaloids, mercury, salicylates, arsenic, or other medicines of a similar nature; as to the effect of giving Kar-Nitum to certain cattle; as to the food value of the sugar, starch, etc., found in Kar-Ru and Kar-Kol; as to the classification of various diseases; the cost of homeopathic remedies; the exclusion of a letter written by some one in New Jersey, addressed to Mr. Hebb, concerning the administration of Kar-Kol to hogs; and as to the potency of certain of the remedies in some of the articles mentioned—we find no substantial error on the part of the court in its ruling upon these questions. The testimony was admitted under well-known rules of evidence or was without prejudice to the defendant.

The judgment of the court below is affirmed.